Next matter is Carpenters Health&Welfare Fund v. MRS. Holloyd. I would like to reserve two minutes for rebuttal, if I may. Thank you, Your Honor. The issue in this case is a simple one, and that is whether... I get really nervous when it comes to that. I put a lot of time into reading, and the lawyer gets up and goes, this is really, really a simple case. Well, perhaps the issue is easy to frame, and then it sort of spins out of control. But as I say, Your Honor, the issue is easy to frame, and that is whether the employer is bound to a collective bargaining agreement obligating it to allow the funds to conduct an audit. Right. But you've also got the trauma-issued foot around here, and that complicates things a little bit more. I think, though, the court below has said, well, there was no contract, and it's our position that in doing so, the court basically ignored almost 60 years now of labor law and national labor policy in connection with collective bargaining agreements that are entered into in the construction industry. Back in 1959, Congress amended the National Labor Relations Act to include Section 8F. In Section 8F, it was a significant change. Back when the Wagner Act was passed in 1935, the original National Labor Relations Act, it primarily concerned itself with the industrial workplace, and unions had to have a majority before they could get a contract, before they could bargain and enter into a contract. Because of the uniqueness of the construction industry, which much like the line of territory in the last case, is very fluid. Jobs come, jobs go. They don't last very long. Congress significantly, while otherwise amending the Act to really make things more restrictive for unions, nevertheless included as an amendment Section 8F that allowed employers primarily engaged in the construction industry to enter into collective bargaining agreements with unions, even where there was no showing of a majority. You know, help me with the complaint here. Did you allege in the complaint that the 2015 collective bargaining agreement was the extension of the 1997 agreement that was contemplated or included in the language any additions, modifications, extensions, or renewals thereof? That's in the agreement with IFCA. Was that alleged? No, not in so many words. You won't find a paragraph that specifically cites the 2012-2015 IFCA agreement as being an extension of the 1997 adoption agreement or being an extension of the agreement that was in place when the adoption agreement was signed. However, I think that was because the agreement speaks for both agreements, both the 1997 ME2 evergreen adoption agreement called what you will a white sheet. It's got many names in the industry. But it states on its terms clearly that you agree to be bound by the IFCA agreement in place and anything that comes after it. But it doesn't say anything that comes after it. It uses specific language and talks about an addition, modification, or renewal. And in fact, in this case, you have an agreement. You have the 1997 agreement, which ran to 2001, and you have the agreement that you're claiming rights under that started in 2004. We've got a big gap in there. I mean, how do you get from agreement A to agreement, call it maybe D or E, and you've got a gap in there? How do we know what happened? I mean, we can assume what happened, but the complaint doesn't necessarily say what happened. And I can see the complaint doesn't lay out that there was success agreement connecting. I can see that. But the IFCA agreement speaks for itself. I mean, as it's titled, it's the IFCA agreement. There's nothing new between the parties. It's still the MRC. It's still IFCA. Perhaps if there were a change in one of the names of the entities, then there would be a higher burden on the funds part to link, to establish the causal nexus between the agreement that was in place. If you concede that the deficiency in the complaint that has been alluded to by both of my colleagues, then how come the red light isn't on and we're done? Well, I'm not conceding a deficiency. What I'm conceding is that you won't find a paragraph that says what Judge Fischer had suggested. And you don't think that's a deficiency? No, I do not, Your Honor. And how do we get over that? Well, because of the plain language of the documents that were referenced in and attached to the complaint. And that is, again, the 1997 B-2 talks about extensions, modifications, renewals, and what is attached is the 2012 to 2015 IFCA agreement. What else can it be other than an extension, modification, or renewal? Without letting anyone know what's happened during the gap in time that Judge Fischer alluded to, how do we make that leap that you want us to make? Well, I think, one, I would remind the Court that, again, this is a motion to dismiss. And thus, as is well established, the complaint should be read in the light most favorable to the complainant, to the person bringing the complaint. And I'm sort of offering that as a preface to answering your question. So the fact that the agreements were attached, there's plenty there, I think, to allow someone at the motion to dismiss stage to conclude that the complaint is sufficient. But getting more to your question, Judge Greenway, with all due respect, I'd suggest what the Court is seeking is something that not even the employers under the law are entitled to. When they sign these Me Too agreements, they say, look, all I know, I'm just telling you I agree to be bound by whatever agreement is in place when I come to town. Because, again, this being a construction industry, there's a fair amount of transients. They're in town, they're out of town, they may be gone for years. There's nothing in there that says, well, when I get to town, you need to show me that this document is, in fact, an extension, modification, or renewal. No. There are three ways one can bargain. One is they can say, I want to bargain my own contracts with the nuts. Two is I'm going to join an association and give my bargaining rights to the association, whereby I have a voice, I have a seat at the table, and the association can solicit my views. And then the third is what you have here, where the employer just said, yeah, whatever. Basically, whatever. Sounded like my daughter. When I'm in town, I'll abide by whatever contract is in place, and that's it. And that's what the me too is here. This isn't Lutterbach, which is the second scenario, which is what the lower court relied upon in saying there was no contract. That was the second scenario where an employer said, I'm going to give my bargaining rights to the association, but I'm going to see what happens with the association. It wasn't a simple me too whatever type of agreement. So in that scenario, the union isn't obligated to, well, the funds for that matter, it's not obligated to go to the employer when he comes back to town and say, well, here's our agreement, and by the way, here's the ones you missed while you were out of town. So I think that's why the pleadings are sufficient. The pleadings clearly state, clearly indicate there's the 97 agreement. On its face, there can be no dispute that it is what's called a me too agreement. I understand councils take an exception to the use of that term, but that's what it's called because that's exactly what it is. And it was never – it was never – Let me ask you one question about – you mentioned about the parties didn't change, and I don't know whether this changes anything or not, but the Metropolitan Regional Council of Carpenters, who was the signator of both agreements that we're talking about here, has disbanded. Well, not disbanded, it was merged. What happened to it? Whatever happened to it, does that have any impact on this case? Not in this case, Your Honor, no, because in my understanding, we're talking about an audit for a finite period covered by the 12 to 15 contract. The merger of the Metropolitan Regional Council into the Northeast Regional Council of Carpenters I don't think has any bearing on this case. Okay. So if we assume for the sake of this argument that the pleadings are sufficient, then we get to the question of was there a contract. I think that this MeToo agreement speaks for itself. It's entirely consistent with, again, almost 60 years of national labor policy in this regard. ADEF was enacted to avoid the very scenario that actually advances now or advanced before the district court. As much as I promise not to read, I'll give you a quick quote from the legislative history of Section ADEF from Representative Frank Thompson, Jr. of New Jersey on August 11, 1959. Speaking in favor of the amendment, he pointed out a number of reasons, but the third is the most relevant to this case. Third, it is manifestly inefficient to negotiate a separate contract for every project. Therefore, the building trade unions and contractors follow the practice of working at a scale of wages and other terms of employment which will be applicable to all projects within a specified geographical area for a substantial period of time. And that's exactly what these adoption agreements are designed to accomplish. An employer comes to town. He wants to be able to take advantage of a ready pool of employees and know what the costs are when he's bidding a job. Those were the other two key examples cited by Senator Kennedy when he proposed the amendment. And the parties go about doing it in this manner. It's not in dispute that at no time, because you're not trapped forever, if you no longer like the deal, you no longer wish to be union, the employer can get out simply by sending a written notice to the union 90 days prior to an expiration date. That did not happen here. So the district court simply got it incorrect when it relied on Lutterbach, which again was a different factual situation. Clearly, the Lutterbach standard is correct as far as when you're dealing with association bargaining, inaction is not enough to bind you. But Lutterbach, the employer in that case, was a member of the association, assigned his bargaining rights to the association, but he never signed to me too. He was waiting to see what the contract would be. And so when he left the association in that case and allegedly didn't give the union notice, that was insufficient. But that's not this case. So Lutterbach's different not just because of the short-form agreement difference, but the multi-employer difference. Well, it's different in that I think your first point is the more cogent one. It's different because he never signed a yeah, whatever. He never signed a document that said I'll agree to anything, just tell me what it is, because I want to work here. He instead assigned his bargaining rights to the association. He would have been a party. And as a result, he would have been covered by the master agreement, the master association agreement, which is what happened here, but again, different scenario. In Lutterbach, he showed that the employer there said, okay, I'm not going to negotiate my own agreement and slip the nuts. I'm going to join this association of employers, and they'll negotiate on my behalf this area-wide agreement, but I'll be a party to it. I can offer input. In this case, by virtue of the METO agreement, all the employer said was I'll sign and pay whatever the association agreement says I'm a party to. He forfeited his right to bargain. He agreed to be bound by the IFCA agreement, but he forfeited his right to complain about whatever IFCA came up with, as opposed to someone as in Lutterbach who would have had a seat at the table. And so in sum, I respectfully submit that the pleadings are sufficient, particularly for a motion to dismiss, but more to the point, there is a contractual agreement in place, and as a result, there's also a contractual obligation on the part of the employer to allow itself to be ordered. Did you come across the case W.D. George from the Sixth Circuit? The name is ringing a bell, Your Honor. Unless there are any more questions, thank you. When your complaint was dismissed, one other question, when your complaint was dismissed, did you request the right to amend? No. I believe there was a request for re-argument that was denied, and reconsideration was denied, and then this appeal was taken. Okay. Thank you. Thank you. In 22 years, this is the first time I've seen someone come to the podium with just an iPad, and a small iPad back. It's very impressive. I just recently concluded a trial in the district court, and I completed almost the entire trial week-long on the iPad with some assistance and backup with a laptop. Are you willing to discuss the next court meeting to come and talk with my colleagues? It was helpful. Good afternoon, Your Honors. My name is Walter Zimelon. I represent the police in this case, Management Resource Systems, and Douglas Marion, and we simply ask that this panel affirm the holding of the district court, which dismissed the Carpenters Union and Associated Funds complaint in its entirety. Well, Zimelon, let's say we do that. Should it be without prejudice to allow plaintiffs to re-plead? Well, I think, Your Honor, the panel was right to seize on the issue of Twombly, and it was good to hear my opponent concede that the pleadings do not contain the necessary facts to survive the heightened pleading standard of Twombly and Ithbal and its progeny. He didn't quite make that concession. Well, Your Honor, I think he did, Your Honor, and that's because the key elements upon which his claim is based are absent from the complaint. The allegation that this is an extension, a modification, or a continuation of the 1997 agreement is absent. In fact, the words 1997- Are you saying that because he doesn't have what, in your view, is the magic words, that that should be the basis for our affirmance? I think, in my view, he doesn't even contain the basic facts upon which his theory of liability rests, which is the 1997 agreement contained this language, and it continued in perpetuity into the 2012 agreement. I believe Judge Fisher was correct to say you have this gap. You don't even have so much as the reference to the 1997 agreement in the pleadings. It doesn't even reference the 2012 agreement by name in the pleadings. But the agreements are there. The agreements are attached, but under Ithbal and Twombly, it's not for the defendant to parse the pleadings. He doesn't have to parse the pleadings. He read the 97 letter, the assent letter, and when he made his arguments as it's framed in the complaint, you knew exactly what he was saying. Well, no, Your Honor, and, again, I don't believe I have to parse the pleading to determine his new theory of liability, which, Your Honor, was raised for the first time in response to our 12b6 motion to dismiss. Now, that is important because the court asked whether or not the appellants ever moved to amend their pleading. As the panel knows, under Rule 15, when I filed my Rule 12b6 motion and pointed out the deficiencies in the pleading, the appellant had as a matter of right the ability to correct those deficiencies in the pleading and file an amended complaint, and he chose not to. And he had the ability after the judge issued, the district court entered its order to seek leave to amend, to correct the deficiencies in the appellant's pleading, and the appellant chose not to. And this argument that, and taking us down this path of Section 8F and Section 9A of the National Labor Relations Act, and whether it's a continuation, modification, or extension, the 2012 agreement is a continuation, modification, or extension of the 1997 agreement, finds its way before the court simply by mode of a reply to the motion to dismiss. And there's another point that needs to be emphasized on the issue of the deficiency of the pleadings and whether or not the pleadings were sufficient. He hasn't preserved the issue. Hold that point. In paragraph 3 of the 97 assent letter, it states that in the gap period between an expired CBA and a successor CBA, the terms of the successor CBA will govern retroactively. Now, if the assent letter was not meant to bind your client to successor CBAs, then what's the purpose of that provision? Well, Your Honor, to... And I'm specifically trying to address what you've referred to as the gap period. Again, we don't know because it wasn't pled. None of this is pled. How you get, as Judge Fischer said, how you get from Agreement A to Agreement B is devoid in the complaint. You get there because Agreement A says, I'm bound beyond subsequent agreements, renewals, extensions, modifications, and then you've got 2012, 2015, whatever it is, agreement, which on the face of it appears to be the renewal, extension, modification that was referred to specifically. But otherwise, what's the whole purpose of the 1997 assent letter? I don't know, but that is the... You can't possibly stand before us and say you don't know. It's the appellant's duty to plead that in the complaint, how you get from A to B. It's not for me to try to guess how you get from A to B. And, Your Honor, this issue of whether or not the pleadings... Now, again, procedurally, this was dismissed in a 12b6 motion, and the district court determined that the pleadings were not sufficient. The issue of whether or not the pleadings were not sufficient has not been preserved before this court. The issues on appeal are not whether or not the pleadings were sufficient to survive a 12b6 motion to dismiss. Appellant hasn't put that issue before the court. Appellant has only put before the court the issues raised via the Lutterbach argument and the 8f argument. So that is a point that cannot be lost in this argument, and I believe that the failure to preserve the adequacy of the pleadings, is fatal, and it allows the court to dismiss it on that basis alone. Okay, but let me ask you this question. If we disagree with the district court's view on Lutterbach, why doesn't that reinstate the complaint? Because if you disagree with the issue on Lutterbach, you shouldn't disagree with the issue on Lutterbach because... I understand that you're saying that, but that's why I pose this as a hypothetical. Because if we disagree with the district court, doesn't that essentially reinstate the complaint? No, Your Honor, because the issue that would allow the court to do that is not before the court, which is whether or not this complaint was sufficiently pled to survive a 12b6 motion to dismiss, whether or not there were sufficient facts contained in the complaint to support the appellant's theory of liability. And appellant has not preserved that issue for appeal. The Lutterbach argument, the 8f argument are interesting arguments. They're nice arguments, but they're arguments that come second. Before we get out the back door, appellant has to explain how he preserved an issue for appeal to get through the front door, which is how has he preserved this issue, how has the appellant preserved the issue of appeal of whether or not his pleading was factually deficient. That was a specific holding of the district court. It was factually deficient, did not meet the pleading requirements of Iqbal, and the complaint was devoid of, and quoting right from the district court's opinion, the district court specifically held that, and let me just bring it up, and this is a matter that's never been addressed, is that quoting from the district court's opinion, there are no allegations in the complaint suggesting that the 2012-2015 CBA is a modification, extension, or renewal of the 1997-2001 CBA. That issue has never been addressed at any point, even in the argument presented here before the court in the appellant's brief. Well, look at the brief now, and I guess I could put blinders on when I look at pages 2 and 3 of the brief and read it as myopically as is humanly possible, and then maybe I would conclude that it's not there, but if I read this with even a modicum of common sense and some appreciation of the construction industry and contracts and what the parties must have had in mind here, it's hard to say that it doesn't appear in pages 2 and 3 of this brief. It's issue one, it's issue two, it's the whole thrust of his argument. You've got this subsequent contract, which is only relevant because of this initial 1997 agreement where the parties agreed to be bound by what he's asserting, the subsequent contract, there's no termination, there's no notice of termination, therefore there's a contract here, it's not lauded back at all, and the parties have agreed that they would subject themselves to an audit, and the employers agreed to subject themselves to an audit, and then make certain contributions to the fund that he's alleging were made. I don't know how you can read this brief and not come to that conclusion. Why then hasn't it been pled? Why wasn't it pled initially? Why wasn't it pled in a response to our 12b6 motion? And I do not believe that the specific issue on appeal before the court is whether or not the district court incorrectly determined that the complaint was factually sufficient to survive a 12b6 motion. These other arguments, Your Honor, are secondary. We can get into them. But, Your Honor, why are you prejudiced? If we do get into them, how is MRS prejudiced? Were you surprised, which is the whole Iqbal or Twombly concept, to avoid surprise by having enough information in the pleadings? The other thing which is confusing, in the court's language, they specifically said they weren't changing the standard. We're still on notice pleading here, even though one could argue, and people have argued, that Iqbal and Twombly take us into a realm beyond notice pleading. Taking the court at its word, we're still looking at notice pleading. Given the complaint and its inefficiency to have the fact that that wasn't connected, that one little line, maybe a millimeter too long, wasn't drawn between those two dots, how were you prejudiced? Because there's no expert. We know now. Of course, we know now because it's been argued in the reply brief. It's been argued before the court what their theory of reliability is. But that's not the standard for a complaint. You've got to answer the question, which is prejudice. I'm hoping there will be an answer at the end of this, or more. How are we prejudiced? Well, it's tough to go back in time to tell us how are we prejudiced now, as opposed to how are we prejudiced at that time. He did a complaint. He did a complaint. The complaint says what it says. I got it in the Senate Agreement. I got a 2015 agreement attached to it. He's alleging that we're in violation of the agreement set forth in the 2015 agreement. There's no termination here. Going back to that moment when whoever read the complaint, how were you seated behind you on this? What was the surprise? Well, Your Honor, I think there's the issue of the pleading, and then there's the issue of we can move to Lutterbach, which is, okay, assuming for a second that this issue of the sufficiency of the pleading is preserved and that the facts alleged in the complaint are sufficient to support the appellant's theory of liability. Lutterbach is very clear, and as my opponent stressed, Section 8F is a very important issue for the construction industry. On Lutterbach, what he relied on principally was the fact that there was no short-form agreement. It's irrelevant whether it was a short-form agreement or not, because the importance of Lutterbach is the public policy underpinning Section 8F. And what distinguishes Section 8F from Section 9 of the National Labor Relations Act is that under Section 8F, at the termination of the agreement, the employer is free to bargain for a new agreement or free to walk away. That's different than Section 9A. Section 9A imposes an affirmative obligation on the employer to continue bargaining with the union for a successor agreement. I'm sorry, but that's the whole purpose of him bringing up the short-form agreement. You made an agreement. Your agreement is it's going to continue. Well, then that agreement vitiates statutory language, protecting employers' right to bargain for itself and bargain for a successor agreement under Section 8F. You put a gun to your client's head in 1997 and said, sign me a sump letter, right? Excuse me, I didn't get that. I said, no one put a gun to your client's head in 1997 and said, sign me a sump letter. Those are the terms of the sump letter, that it will continue. Right. But if you look at the holding of Lutterbach. Did you say right? Did I hear that correctly? I'm saying that no one held a gun to his head, Your Honor. The question was, those are the terms of the sump letter, that it will continue. And your response was, right. I just want to make sure that I heard that correctly. Well, no. The terms of the consent letter, I think, I don't have in front of me. It's not consent. It's assent. I mean, that's what this is all about. You can't walk away from the terms of the assent letter, right? You can under Lutterbach. You'd be lucky if you had a really good day. Lutterbach and the progeny, specifically the iron workers case in the Northern District of Illinois, if you have this language in such an agreement and you take mere inaction, you don't take an affirmative step to terminate the agreement. This is quoting Lutterbach. I don't think he was just quoting. I'm going to quote it for you. Whether an 8F employer in a multi-employer unit, which I think is relevant at the moment, is bound by inaction to the success of multi-employer contracts. So at its inception, Lutterbach is different than this particular instance, and then there's also the fact that the short form agreement was signed and that your client knew exactly what the terms of that assent letter was and the implications of it. So I'm at a loss for, and I don't think you've answered the prejudice question yet, but that's, I guess, an aside. So I'm just not, I want to be with you, but I'm not there yet, so help me. Your Honor, the language is what the language is. We are not going to dispute that that says it in the agreement. And on its face, that language may lead the court to say, hey, under normal contract interpretations, why aren't they bound in perpetuity?  You signed this in 1997, and unless you do something affirmatively determinative, you're bound in perpetuity. And a contract is a contract is a contract is to quote from the appellant's brief. The reason, and if you allow me to continue, I notice the red light is on. Please. The reason is that you have an issue of contract that intersects with an issue of important public policy and rights that are guaranteed by statute, rights that are guaranteed by Section 8F of the National Labor Relations Act. And can such language vitiate by holding someone to contract in perpetuity unless they take affirmative steps? Can it vitiate an employer's right under Section 8F to walk away from an agreement when it expires and freely bargain for itself? And the answer to that is no. What is the way in which you can turn it down? It doesn't say. You've been noticed. There's two assent letters. There's two assent letters. If we're going to talk about what they attach to the complaint, there are two assent letters. There's another important point that can't be lost. If we're going to talk about the language of the assent letters and what distinguishes these assent letters from other assent letters that have been discussed by the courts, there never is an assignment of bargaining rights that is granted to this multi-employer organization. And there's one undisputed fact. Management Resource Systems was never a member of this organization. So what the Carpenters Union is trying to do, in addition to holding management resources to the terms of an agreement in perpetuity, it's also saying that when there's no contractual language to support this, that you've also conceded your rights to the Interior Finishing Contractors Association. You've given away your bargaining rights. They can't make that argument. It doesn't exist. There is no such language in these letters of assent. Therefore, Management Resources maintains the right to bargain for itself. It has not given up its Section 8F rights to bargain for itself. But here's what I don't understand. In the letter, it says, until one party shall provide to the other written notice by certified mail of intent to terminate the then current agreement. So if your client wanted to walk away, your client has agreed to a manner in which it can walk away. It just requires a written notice. Correct, Your Honor. I understand how Your Honor is saying that the burden to terminate this agreement wasn't so great and why didn't they do it. And there's two responses to that. Number one, keep in mind, this agreement was signed. It's a letter agreement that was signed in 1997. Nearly 20 years later, the Carpenters' Union comes to Management Resource Systems, a company based in North Carolina, a company that travels all around the country to perform work, and says, oh, you're bound by this agreement between 2012 and 2015 because you signed something 20 years ago. We've never enforced our rights in the last 20 years to impose this agreement upon you. We've never reminded you of it. We say impose this agreement upon you. What is it that they're asking for? An audit and contributions. So we sat on this thing for 20 years. Now, all of a sudden, we're going to say, you know what, we're going to impose our rights on you. Not 20 years, but you made your point. Have you come across a case, W.D. George, from the Sixth Circuit? No, Your Honor. Thank you. Thank you. Thank you. George. Hi, Your Honor. I'll touch upon his last parts first. There's nothing about this Me Too agreement that vitiates DECLA, vitiates employers' rights under ADEF. It's true that in the standard ADEF agreement, at the expiration of the agreement, both sides were able to walk away. But this agreement included language that required more than that. And there was a case in our brief, Chen Management Co., from the NLRB, made it abundantly clear that automatic renewal clauses in ADEF agreements will be given effect, and they operate to bind the parties. Why? Because there's nothing perpetual about the agreement. You can repeat that term as much as you want, but it obviously can't be perpetual when all the employer needed to do was send a letter. Similarly, the fact that they may have been in North Carolina for almost 20 years is immaterial. Again, it was cited in our brief. There's lots of NLRB law that makes it clear that that's how these things are designed to work. The fact that when you're in town, you agree to be bound by these terms, and then you're not in town for 10 years doesn't mean that when you come back, oh, it's expired. And the bargaining rights issue, they did give their bargaining rights away. When they signed a document that said, we will agree to be bound by whatever they come up with, if they wanted language that said, well, we'll agree to be bound, but we get to reopen one or two things, they could have asked for that. This is bargaining. This is how labor relations works. That's not what they signed. That's not what they signed. They signed what is a typical and classic MeToo agreement. Finally, as far as the pleadings, the judge, the lower court didn't dismiss the case simply because he found that the pleadings were deficient. He engaged in a legal analysis. He said, well, this is what you've pleaded, and so now I have to look at VoterBot and see whether the employer agreed to be bound by this agreement. There was a legal analysis, which is why I think the appeal is framed the way it was. So we would ask that the decision of the lower court be vacated and the matter be remanded back to the district court. Thank you. Thank you for your argument. We'll take a matter of your advising.